Dylan B. Carp (State Bar No. 196846)
Angel R. Sevilla (State Bar No. 239072)
JACKSON LEWIS P.C.
50 California Street, 9th Floor
San Francisco, California 94111-4615
Telephone:    (415) 394-9400
Facsimile:    (415) 394.9401
E-mail:   Dylan.Carp@jacksonlewis.com
E-mail:   Angel.Sevilla@jacksonlewis.com

Attorneys for Plaintiffs
GISELE NORRIS and HENRY YUAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GISELE NORRIS and HENRY YUAN, | Case No.: |
| Plaintiffs, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| AON PLC; AON GROUP, INC.; AON RISK SERVICES COMPANIES, INC.; and DOES 1 through 100, inclusive, | |
| Defendants. | |

Plaintiffs GISELE NORRIS ("Norris") and HENRY YUAN ("Yuan") allege:

**THE PARTIES**

1.      Plaintiff Norris is a resident of Marin County, California.

2.      Plaintiff Yuan is a resident of San Francisco County, California.

3.      Plaintiffs are informed and believe, and thereon allege, that Defendant AON PLC is a corporation organized under the laws of the United Kingdom and has its principal place of business outside the State of California.

4.      Plaintiffs are informed and believe, and thereon allege, that Defendant AON GROUP, INC. is a corporation organized under the laws of the State of Maryland and has its principal place of business outside the State of California.

1

5.      Plaintiffs are informed and believe, and thereon allege, that Defendant AON RISK SERVICES COMPANIES, INC. is a corporation organized under the laws of the State of Maryland and has its principal place of business outside the State of California.

6.      Defendants are collectively referred to as "AON."

7.      Norris and Yuan were employed by AON in California.

8.      AON is qualified to do business in California and maintains offices in California including an office in San Francisco and San Jose, California.  AON is a provider of risk management services, insurance and reinsurance brokerage, and human resource consulting and outsourcing.

9.      Plaintiffs are currently unaware of the specific identities of DOES 1 through 100. Plaintiffs will amend their Complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe, and thereon allege, that each of said fictitiously named defendants is responsible in some manner for the occurrences herein alleged.

**JURISDICTION & VENUE**

10.      Jurisdiction in this Court is proper under 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

11.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(2).

**INTRADISTRICT ASSIGNMENT**

12.      This case should be assigned to the San Francisco/Oakland Division under Civil L.R. 3-2.

**ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

13.      As a condition of her employment and continued employment with AON, Norris entered into a Restricted Stock Unit Agreement with AON on December 4, 2009 (Exhibit A) and a second Restricted Stock Unit Agreement with AON on June 11, 2015 (Exhibit B).

14.      As a condition of his employment with AON, Yuan entered into a Restricted Stock Unit Agreement with AON on June 7, 2020 (Exhibit C), and a Confidentiality and Non-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Solicitation Agreement with AON on July 14, 2016 (Exhibit D). The three Restricted Stock Unit Agreements are referred to as the "RSU Agreements."

15.    The RSU Agreements purport to restrict Plaintiffs from doing business with or soliciting the customers or employees of AON for two years after Plaintiffs leave their employment with AON, even if the solicitation does not involve the use of confidential or trade secret information. The restrictions are imposed "to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment." The RSU Agreements state, in relevant part:

> The Participant (on the Participant's own behalf or on behalf of any
> other person or entity) will not, during the course of employment,
> and for a period of two (2) years after the Participant's Termination
> Date, directly or indirectly, call upon, solicit, accept, engage in,
> service or perform, other than on behalf of Aon, any business of
> the same type or kind as the Business performed by Aon…

16.    The RSU Agreements purport to restrict Plaintiffs from communicating with AON's employees to discuss employment opportunities with Marsh USA Inc. ("Marsh") or any other employer. The RSU Agreements state, in relevant part:

> The Participant hereby also agrees, for the duration of the term of
> the covenant set forth in Section 9(b) [two years] herein not to,
> directly or indirectly, solicit induce, or cause any person or other
> entity to solicit, induce, any employee of Aon to work for the
> Participant or for any third party or entity, or to leave the employ
> of Aon.

17.    Although Plaintiffs performed their work solely in California, the RSU Agreements deprive Plaintiffs of their protections and benefits under California law, in violation of California public policy and California Labor Code section 925. The RSU Agreements state, in relevant part:

> The validity, interpretation, instruction, performance, enforcement
> and remedies of or relating to this Agreement, and the rights and

3

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction…

18.    The Confidentiality and Non-Solicitation Agreement contains a purported employee non-solicitation covenant.

19.    These purported restrictions are void and unenforceable under controlling California law and public policy, including without limitation Business and Professions Code section 16600 and California Labor Code section 925.

20.    On or around January 20, 2021, Plaintiffs resigned from their employment with AON to become employed by Marsh.  AON is a competitor of Marsh.

21.    On or around January 27, 2021, AON sent letters to Plaintiffs stating AON's intent to enforce the illegal restrictive covenants in the RSU Agreements (Exhibits E and F).

22.    AON demanded assurances from Plaintiffs that they "have not and will not solicit, accept service or perform work for Marsh or any other party with AON clients."

23.    AON also demanded assurances from Plaintiffs that they "have not and will not solicit, accept service or perform work for…any other party with Aon clients."

24.    Defendant has threatened to take action to enforce the purported restrictive covenants of the RSU Agreements to try to prevent Plaintiffs from their gainful employment in California with Marsh and their right to compete lawfully against Aon for business.

25.    Plaintiffs each earned in excess of $75,000 per year when employed by Aon and will earn in excess of $75,000 per year during their employment by Marsh.  Plaintiffs each generated profits and revenue in excess of $75,000 per year when employed by Aon and will do so during their employment by Marsh.

### FIRST CAUSE OF ACTION FOR DECLARATORY RELIEF

### (Against All Defendants)

26.    Plaintiffs incorporate by reference as though set forth in full the allegations in Paragraphs 1 through 25.

4

27.     The RSU Agreements and Confidentiality and Non-Solicitation Agreement contain a number of void, illegal, and unenforceable provisions, including restrictive covenants that violate well-established California law, including Business and Professions Code section 16600.

28.     The RSU Agreements also include unenforceable Illinois choice-of-law and forum selection provision that violate California public policy and California Labor Code section 925.

29.     AON has demanded assurances from Plaintiffs that they "have not and will not solicit, accept service or perform work for Marsh…".

30.     Plaintiffs are entitled to a judgment declaring that the purported restrictive covenants in the RSU Agreements and Confidentiality and Non-Solicitation Agreement, including the restrictive covenants and Illinois choice of law and forum selection provisions, are void, unenforceable and in violation of California public policy.

## SECOND CAUSE OF ACTION FOR INJUNCTIVE RELIEF

### (Against All Defendants)

31.     Plaintiffs incorporate by reference as though set forth in full the allegations in Paragraphs 1 through 30.

32.     Pursuant to California Code of Civil Procedure section 526(a)(1), Plaintiffs are entitled to the relief demanded in this Complaint, and the relief consists in restraining the commission or continuance of the restrictive covenants in the RSU Agreements and Confidentiality and Non-Solicitation Agreement, including the non-solicitation provisions in the RSU Agreements and Confidentiality and Non-Solicitation Agreement.

33.     Any attempt by Defendant to enforce any unenforceable provision of the unlawful RSU Agreements and Confidentiality and Non-Solicitation Agreement would create great or irreparable injury to Plaintiffs; therefore, Plaintiffs are entitled to an injunction pursuant to California Code of Civil Procedure section 526(a)(1) to prevent Defendant from enforcing any unenforceable terms in the RSU Agreements and Confidentiality and Non-Solicitation Agreement concerning restrictive covenants, venue and forum selection, or choice of law.

34.     Plaintiffs are informed and believe, and thereon allege, that Defendant will seek to enforce the unlawful RSU Agreements and Confidentiality and Non-Solicitation Agreement in

violation of California law.  Pursuant to California Code of Civil Procedure section 526(a)(1), Plaintiffs are entitled to an injunction to prevent any such attempted enforcement by Defendant.

### THIRD CAUSE OF ACTION FOR UNFAIR COMPETITION IN

### VIOLATION OF BUSINESS & PROFESSIONS CODE SECTIONS 17200 *et seq.*

#### (Against All Defendants)

35.    Plaintiffs incorporate by reference as though set forth in full the allegations in Paragraphs 1 through 34.

36.    The aforementioned wrongful conduct by Defendant constitutes unfair business practices in violation of Business & Professions Code sections 17200 *et seq.*

37.    Notwithstanding the foregoing, no adequate remedy at law exists that would allow Plaintiffs to avoid irreparable harm as a result of Defendant's conduct.  For this reason, and in addition to any other remedies as may be allowed, Defendant must be precluded from seeking to enforce illegal, void and unenforceable provisions in the RSU Agreements and Confidentiality and Non-Solicitation Agreement.

### PRAYER FOR RELIEF

NOW, THEREFORE, PLAINTIFFS PRAY FOR RELIEF AS FOLLOWS:

1.    For judgment declaring that the purported restrictive covenants in the RSU Agreements and Confidentiality and Non-Solicitation Agreement are void and unenforceable;

2.    For a temporary restraining order and preliminary and permanent injunction prohibiting Defendant from enforcing the purported restrictive covenants contained in the RSU Agreements and Confidentiality and Non-Solicitation Agreement;

3.    For reasonable attorneys' fees and costs of suit; and

4.    For such other relief as the Court may deem proper.

Dated:  February 5, 2021                          JACKSON LEWIS P.C.

By:  _____
     Dylan B. Carp
     Angel R. Sevilla
     Attorneys for Plaintiffs
     GISELE NORRIS and HENRY
     YUAN

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**EXHIBIT A**

# AON CORPORATION
## 2001 AON STOCK INCENTIVE PLAN
### RESTRICTED STOCK UNIT AGREEMENT

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon Corporation, a Delaware corporation (the "Company") and **GISELE A NORRIS** (the "Employee").

The Company desires to grant the Employee restricted stock units ("RSU's"), each RSU representing the right to receive a share of Aon common stock ("Common Stock"), $1.00 par value per share of Common Stock, to encourage the Employee to remain in the employ of the Company or its subsidiaries, to provide the Employee with an incentive to contribute to the financial progress of the Company, and to encourage ownership of the Company's stock by the Employee.

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.**  The Company grants under the 2001 Aon Stock Incentive Plan (the "Plan") an award of **1,000.00**   Restricted Stock Units on **11/20/2009** (the "Grant Date").

2. **Vesting of Restricted Stock Units.**  The shares will vest 25% on each of the Grant Date anniversary dates in years 2, 3, 4 and 5.

3. **Tax Withholding Obligations.**  Prior to the delivery of shares, the Employee shall deposit with the Company, through means provided for by the Company, an amount of cash equal to the amount determined by the Company to be necessary upon delivery of the shares for any taxes, social security / social insurance contributions, or the like under any government statute. Alternatively, the Company may, at its sole election, a) withhold the required amounts from the Employee's pay, or b) may permit the Employee, subject to such conditions as the Company shall require, to sell a number of shares otherwise deliverable having a value sufficient to satisfy all or part of the Employee's estimated total tax obligations associated with vesting of the shares.  The Company shall not deliver any of the shares until and unless the Employee has made the deposit required herein or proper provision for required withholding has been made.

4. **Effect of Termination of Employment.**
   a) **Voluntary termination prior to age 55**.   The unvested portion of the RSU will be forfeited.
   b) **Termination due to disability or death.**   All unvested RSUs will be fully vested immediately.
   c) **Involuntary termination (other than for cause) or voluntary termination on or after age 55**.   The RSU shall be immediately vested pro rata.  The remaining unvested portion of the RSU shall be forfeited. Pro rata vesting is based on the period of employment since the Grant Date.
   d) **Termination for cause.**  All unvested shares shall be forfeited.  Termination for cause shall mean performing an act of dishonesty, fraud, theft, embezzlement, or misappropriation involving Employee's employment with the Company, or breach of the duty of loyalty to the Company; performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company and / or Employee; material violation of Company policies and procedures including, but not limited to, the Aon Business Conduct Guidelines and the Aon Code of Ethics; material non-compliance with any terms of an employment agreement; or, performing an act resulting in a criminal felony charge brought against the Employee or a criminal conviction of Employee (other than conviction of a minor traffic violation).

5. **Receipt by the Employee of the Prospectus.**  The Employee acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference.  The Employee represents and warrants that the Employee has read the Plan and agrees that all RSU's awarded under it shall be subject to all of the terms and conditions of the Plan.

RSU 2009

6. **Issuance of Shares.**   RSUs shall be converted to shares of Common Stock as of the vesting date. Shares of Common Stock will be issued to the Employee as soon as practicable after the vesting date, subject to Section 3 of this Agreement

7. **Rights as Shareholder.**   The Employee may not have voting or any other right as a shareholder of the Company with respect to the RSU's. Upon conversion of the RSU to shares of Company Stock, the Employee will obtain full voting and other rights as a shareholder of the Company

8. **Additional Covenants**

   a) **Non-Solicitation Covenant**

      (i) **Business Considerations.**  The Company in the business of providing  conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and  information systems  on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business").  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  The Company invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Company employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of the Company and that the goodwill engendered by the relationships is intended to inure only to the benefit of the Company; the goodwill is owned by the Company; and the Company shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with the Company.  In addition, the Employee acknowledges that he has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of the Company's confidential and proprietary information; Employee further acknowledges the Company's legitimate interest in safeguarding confidential and proprietary information from disclosure.

      The personal identification of clients of the Company with an employee, including the Employee, creates the potential for the Employee's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of the Company.  Since the Company would suffer irreparable harm if the Employee left its employ and solicited the Business of the clients and prospective clients of the Company, it is reasonable to protect the Company against certain competitive activities by the Employee for a limited period of time after the Employee leaves employment so that the Company may renew or restore its business relationship with its clients and prospective clients. Consequently,  the Employee is willing to enter into the covenants set forth herein in order to provide the Company with reasonable protection for its client and prospective client relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

      (ii) **Covenant Not to Solicit**.  The Employee hereby covenants and agrees that, except with the prior written consent of the Company, the Employee (on the Employee's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the end of employment, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of the Company, any business of the same type or kind as the business performed by the Company from or with respect to (i) clients of the Company with respect to whom the Employee provided services, either alone or with others, or had a business relationship, or on whose

account he worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the termination of the Employee's employment with the Company and, further provided, such clients were clients of the Company either on the date of termination of Employee's employment with the Company or within twelve (12) months prior to such termination and (ii) prospective clients of the Company which the Employee alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the end of employment and to which a proposal for services was rendered by the Company during the six (6) months prior to the end of the Employee's employment with the Company.  "Client" means any person or entity listed on the books of the Company as such.

**(iii)Covenant Not to Hire**.  The Employee hereby also agrees, for the duration of the term of the covenant set forth in Section 8(a)(ii) herein not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of the Company to work for Employee or for any third party or entity, or to leave the employ of the Company.

**(iv)Acknowledgments**.    The Company and the Employee acknowledge and agree that the covenants contained in Sections 8(a)(ii) and 8(a)(iii) herein are necessary and reasonable for the protection of the Company and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Employee and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect the Company for a limited period of time from unfair competition by the Employee.

The Employee acknowledges that there is no general geographical restriction contained in the preceding paragraph because the restriction applies only to the specified clients of the Company. Nothing in this Agreement shall prohibit the Employee from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business.  The intent of the parties is that the Employee's restrictive covenant is limited only to those clients as above specified.

**b)  Company's Right to Injunctive Relief; Attorneys' Fees.**    The Employee acknowledges that the Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to the Company, and that therefore, in addition to any other remedy which the Company may have at law or in equity, the Company shall be entitled to injunctive relief for a breach of this Agreement by Employee.   In the event that the Company brings an action to enforce the terms and conditions of this Agreement, Employee shall pay the costs and expenses incurred by the Company in bringing such action, including legal fees.

**c)  Trade Secrets and Confidential Information.**    Employee acknowledges that the Company's business depends to a significant degree upon the possession of information which is not generally known to others, and that the profitability of such business requires that this information remain proprietary to the Company. The Employee shall not, except as required in the course of employment by the Company, disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of the Company of which the Employee becomes aware by reason of being employed or to which Employee gains access during his employment by the Company and which has not been publicly disclosed (other than by Employee in breach of this provision).

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of the Company.   All records and equipment and other materials relating in any way to any confidential information relating to clients or business of the Company shall be and remain the sole property of the Company during and after the end of employment.

    d)  In the event this program is determined to be a "deferred compensation plan" subject to Section 409A of the Internal Revenue Code of 1986, as amended, the Company shall as necessary adopt such conforming amendments as are necessary to comply with Section 409A.

**9.**    **Other Provisions**

    **a)**  **Plan Terms Take Precedence over Agreement Terms.**  RSUs are granted pursuant to the Plan, the terms and condition of which are incorporated into this Agreement by reference.  If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.

    **b)**  **Prior Agreement(s) Will Not Control.**  Employee's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

    **c)**  **Restriction on Transfer.**  Unless the RSUs are vested as provided above, they may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

    **d)**  **Right of Employment.**  Grants of RSUs under the Plan and of this Agreement do not confer upon Employee any right to continue in the employ of the Employer.

    **e)**  **Beneficiary.**  An Employee's "beneficiary" means the person(s) or entity designated by the Employee in the most recent written beneficiary designation form filed with the Company to receive the benefits specified under the Plan upon the death of the Employee, or, if there is no designated beneficiary or surviving designated beneficiary, then the estate of the Employee.

    **f)**  **Data Privacy.**  Employee understands and authorizes Employer to share Employee's personal data with the Company, the U.S. parent company.  Employee also understands and authorizes that this data, as listed below, will be shared with third party vendors hired by the Company to assist in administering the Plan.  Employee consents to the Employee's Employer sharing of personal data (i.e. identification data, including name, address, telephone; financial data, including account numbers, wages; personal data, including age, gender, date of birth; education related data, including academic curriculum, professional experience; profession related data, including title and description of functions with the Company).  Employee also authorizes Employer and the Company to receive, possess, use, retain, and transfer the data, in electronic form or other, and to further transfer data to third party vendors for purposes of assisting in the administration and managing Employee's participation in the Plan.

    **g)**  **Need to Accept Grant.**  Employee acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant. If this grant is not accepted within ninety days, the grant will be cancelled and all benefits under this grant will be forfeited.  To accept this grant, the Employee must access the www.netbenefits.fideltiy.com website and follow the instructions for acceptance.  If this grant was distributed to the Employee via mail, Employee must sign the agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

    **h)**  **Computation of Severance / Retirement Benefits.**  Benefits and rights acquired under the Plan do not constitute "base salary" or other regular employment earnings.  Accordingly, Employee understands and accepts that benefits provided under the Plan will not be considered in calculating any of the Company's and its subsidiaries' obligations to Employee for bonus, retirement, severance, termination, health and welfare, or any other such payments, unless otherwise specified in the applicable plan.

    **i)**  **Plan Changes / Acquired Rights.**  Employee understands and agrees that the Company may terminate, change or otherwise alter the terms and conditions of the Plan at any time, and that any such termination, change or alteration will not amount to a breach or breaches, fundamental or otherwise, of Employee's terms and conditions of employment**.** The scope of any change in terms is unforeseen; however, potential changes to the Plan may include, but are not limited to, 1) alteration of the discount at which employees are allowed to acquire Company shares, 2) modification of the vesting and/or offering periods, 3) adjustment of the award amounts, and 4) cancellation of the Plan.  Employee

hereby elects to participate in the Plan with full knowledge that benefits under the Plan can be terminated or otherwise modified by the Company at its sole discretion at any time.

**j)  Waiver.**  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing.

**k)  Severability.**  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**l)  Governing Law**.  The validity, interpretation**,** instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  For Employees outside of the United States, this Agreement shall be governed by the applicable regulations or international treaty.

**m)  Notice**.  All notices given hereunder shall be in writing and, if intended for the Company, shall be addressed to it or delivered to it at its principal office to the attention of Executive Compensation Department.  If intended for the Employee, notices shall be delivered personally or shall be addressed (if sent by mail) to the Employee's then current residence address as shown on the Company's records, or to such other address as the Employee directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON CORPORATION**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**GISELE A NORRIS**                                    **12/04/2009**
**RSU Recipient (Employee)**                                   **Date**

RSU 2009

**EXHIBIT B**

**CALIFORNIA EMPLOYEES ONLY**

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under English law, and its subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **GISELE A NORRIS** (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries or Affiliates, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant. Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as approved by the shareholders of Aon plc on June 24, 2014 (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.**   The Company grants under the Plan an award of **488** RSUs on **05/21/2015** (the "Grant Date"). The Participant understands and agrees that the Participant has no obligation to accept this award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.**   The RSUs will vest in accordance with the schedule set forth in the Participant's account.   The Participant must access the www.netbenefits.fidelity.com website and follow the instructions in order to view the vesting schedule. Notwithstanding anything to the contrary in the foregoing, the Committee may cause the RSUs to vest prior to the vesting schedule set forth in the Participant's account in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.**   The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance, payroll tax, payment on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount actually withheld by the Company or the Employer. The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the grant of RSUs, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the grant or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result.  Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items.  In

this regard, the Participant authorizes the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

**(i)**     withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

**(ii)**    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

**(iii)**   withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorization without further consent); provided, however, that if the Participant is a Section 16 officer under the U.S. Securities Exchange Act of 1934, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein and if the Committee does not exercise its discretion prior to the Tax-Related Items withholding event, then the Participant shall be entitled to elect the method of withholding from the alternatives above.

**b)**  Depending on the withholding method, the Company may withhold or account for Tax-Related Items by considering applicable minimum statutory withholding amounts or other applicable withholding rates, including maximum applicable rates, in which case, the Participant will receive a refund of any over-withheld amount in cash and will have no entitlement to the equivalent Shares.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

**c)**  Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

**d)**  Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4.  **Nominal Value.** At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of Aon plc's articles of association and the U.K. Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5.  **Effect of Termination of Employment.**
    **a)**  <u>**Voluntary termination prior to Retirement.**</u>   In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination prior to Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.
    **b)**  <u>**Termination due to death.**</u>   In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.
    **c)**  <u>**Termination due to disability.**</u>   In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

"Disability" for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer. In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d)** **Involuntary termination (other than for cause) or voluntary termination on or after Retirement.** In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination (other than for cause) or the Participant's voluntary termination on or after Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. The pro rata portion of the vested RSUs shall be calculated by multiplying (i) the number of RSUs subject to the award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days in the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested. The remaining unvested portion of the RSU shall be forfeited. For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU"). A Participant on secondment will be subject to the vesting rule applicable to his or her home country. For a Participant whose principal place of work is inside the EU, the unvested portion of the RSU will be forfeited. The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e)** **Termination for cause.** In the event that the Participant's Termination Date occurs because the Participant is terminated for cause, all unvested shares shall be forfeited. Termination for cause shall mean performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company or its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; material non-compliance with any terms of this Agreement or an employment agreement; or, performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**6.** **Receipt by the Participant of the Prospectus.** The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference. The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.** **Issuance of Shares.** RSUs shall be converted to Shares as of the vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement. Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination contemplated under Section 5(c) or 5(d), the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A. In addition, if the RSUs are Deferred Compensation, the RSUs are settled upon the Participant's separation from service and the Participant is a "specified employee," within the meaning of Code Section 409A, on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.**  The Participant shall not have voting or any other right as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

   a) **Business Considerations.**  Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides.  An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain personal contacts and relationships with clients and prospective clients.  Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's  employment with Aon.  In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, solely for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon.  Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients, and employees.  Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) **Covenant Not to Solicit Clients and Prospective Clients.**  The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two (2) years after the Participant's Termination Date, directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided

services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the twenty-four (24) months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within twelve (12) months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six (6) months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six (6) months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such.

c)  **Covenant Not to Solicit Employees.**  The Participant hereby also agrees, for the duration of the term of the covenant set forth in Section 9(b) herein not to, directly or indirectly, solicit induce, or cause any person or other entity to solicit, induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d)  **Other Covenants.**  Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 11(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period.  Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.  To the extent that there is a conflict or overlap between any Other Covenant and a covenant contained in this Agreement, this Agreement shall control.

e)  **Acknowledgments.**   Aon and the Participant acknowledge and agree that the covenants contained in Sections 9(b) and 9(c) herein are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients and employees are not limited to any particular geographic area.  Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for himself or herself or his or her family by being engaged in the Business.  The intent of the parties is that the Participant's restrictive covenant is limited only to those clients as above specified.

f)  **Company's Right to Injunctive Relief; Attorneys' Fees.**   The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity in an arbitration pursuant to Section 10 below, Aon shall be entitled to emergency, injunctive or other interim relief in an arbitration pursuant to Section 10 below for a breach of this Agreement by the Participant.  The parties acknowledge and agree that Aon Group, Inc. is an intended third-party beneficiary of this Agreement, and may be a named plaintiff in any subsequent arbitration brought by the Company to enforce the terms of this Agreement.  In the event that Aon brings an arbitration to enforce the terms and conditions of Section 9 of this Agreement and prevails in whole or in part in such arbitration, the Participant shall pay the costs and expenses incurred by Aon in bringing such action, including legal fees, to the extent so awarded by the arbitrator (except for the fees and costs of the arbitrator and of JAMS that are payable by the Company as provided in Section 10(f) below).

g)  **Trade Secrets and Confidential Information.**   The Participant acknowledges that Aon's business depends to a significant degree upon the possession of information which is not generally known to others,

and that the profitability of such business requires that this information remain proprietary to Aon.  The Participant shall not, except as required in the course of employment by Aon, or by applicable law (provided that the Participant shall first give Aon plc reasonable advance written notice of any subpoena or other legal disclosure requirement (Attn: General Counsel), with a contemporaneous copy to Aon Group, Inc.), disclose or use during or subsequent to the course of employment, any trade secrets or confidential or proprietary information relating to the business of Aon of which the Participant becomes aware by reason of being employed or to which the Participant gains access during his or her employment by Aon and which has not been publicly disclosed (it being understood and agreed that trade secrets and confidential or proprietary information shall remain subject to this Section 9(g), and shall not be considered "publicly disclosed" for purposes of the preceding clause, if any public disclosure thereof results from a breach by the Participant of this provision, or a breach by the Participant or another person of some other contractual or legal obligation to Aon).

Such information includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. All records and equipment and other materials constituting or relating in any way to any trade secrets, confidential or proprietary information, or relating to clients or business of Aon, and all other Aon property, shall be and remain the sole property of Aon during and after the end of employment, and shall be returned to Aon by the Participant immediately upon its request or the Participant's Termination Date (whichever is earlier).

h)   **Incentive Repayment Policy.**  If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the U.S. Securities Exchange Act of 1934, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy").  The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the long-term equity based incentive award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated.  The Participant can obtain a copy of the Policy from the Global Compensation team.  If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

## 10. Arbitration

a)   The Participant and the Company (including on behalf of Aon Group, Inc.) agree that, to the maximum extent permitted by law, all claims or disputes between or involving the Participant and Aon (including without limitation any subsidiary of the Company) (i) arising under or relating to this Agreement (including without limitation Section 9 hereof) or any Other Covenant, or (ii) involving the interpretation, applicability, enforceability or formation of this Agreement, any Other Covenant, or any portion thereof (including without limitation the agreement to arbitrate in this Section 10, and further including without limitation any claim or dispute alleging that this Agreement, any Other Covenant, or any portion thereof is a contract of adhesion, lacks consideration, is substantively or procedurally unconscionable, is void against public policy, or otherwise is void or voidable for any reason), shall be determined and resolved exclusively by arbitration in Chicago, Illinois (or such other location to which the Participant and the Company may agree) before a single neutral arbitrator (which may include, as provided below, a single neutral Emergency Arbitrator (defined below) and then a single neutral regular arbitrator), in compliance with and as further provided in this Section 10.  Any and all such claims and disputes shall be brought solely in a party's individual capacity and not as a claimant or class member (or similar capacity) in any purported multiple-claimant, class, collective, representative or other similar proceeding, except as otherwise required by law.  Unless otherwise indicated in this Section 10 expressly or by context, the term "arbitrator" means an Emergency Arbitrator and/or a regular arbitrator.

b) The arbitrator shall have the authority to make any award or impose any remedy that is available to a court of general jurisdiction sitting in Chicago, Illinois and that was requested by a party to the claim or dispute, including without limitation the authority to award emergency, injunctive or other interim relief pending the conducting of the arbitration on the merits and the rendering of a final award, whether styled as a temporary or preliminary injunction or otherwise (collectively, "Interim Arbitral Relief"). The arbitrator shall not have the authority to make an award or impose a remedy that is not available to such a court or is not requested by such a party, and the jurisdiction of the arbitrator is limited accordingly. For avoidance of doubt, the parties hereby acknowledge and agree that the Company (including Aon Group, Inc.) or the Participant may assert a claim or dispute encompassed by this Section 10, and seek a remedy or relief for or associated with such claim or dispute (including without limitation emergency, injunctive or other interim relief, or final relief) only in arbitration pursuant to this Section 10, and may not pursue an action in court for or relating to any such claim, dispute, remedy or relief, other than as provided in Section 10(h) below solely for the purpose of entering judgment enforcing an interim or final arbitration award.

c) If a party seeks Interim Arbitral Relief, including without limitation to enforce any covenant in Section 9 of this Agreement or Other Covenant, the arbitration of such Interim Arbitral Relief request shall be administered by JAMS' Chicago, Illinois office and conducted in accordance with the Emergency Relief Procedures set forth in Section 2(c) of the JAMS Comprehensive Arbitration Rules & Procedures (as in effect or amended from time to time, or any successor provision thereto) (hereafter, the "Emergency Relief Procedures" and the "Comprehensive Rules," respectively), except as otherwise provided (whether or not by reference to specific Rules) in this Section 10. During the first thirty-six (36) hours after the filing with JAMS and service of the party's Interim Arbitral Relief request (or, if earlier, the first thirty-six (36) hours after the party's notification (whether or not in writing) to the other party of such request), the parties shall make good faith efforts to confer and to agree upon an arbitrator to hear and decide such Interim Arbitral Relief request (the "Emergency Arbitrator"). If, by the end of such thirty-six (36) hour period (or such longer period to which the parties may agree), the parties are unable to so confer or otherwise do not reach agreement on an Emergency Arbitrator, or the respondent to the Interim Arbitral Relief request does not respond to or cooperate in such Emergency Arbitrator selection efforts, the Emergency Arbitrator shall be selected by JAMS' Chicago, Illinois office in accordance with the Emergency Relief Procedures and this Section 10.

d) If a party demands arbitration and does not seek Interim Arbitral Relief, or if a request for Interim Arbitral Relief has been withdrawn, decided or otherwise resolved (whether by agreement, by an interim award by the Emergency Arbitrator, or otherwise) and the arbitration of the claim or dispute proceeds thereafter, such arbitration shall be administered by JAMS' Chicago, Illinois office and conducted in accordance with the Comprehensive Rules, except as otherwise provided (whether or not by reference to specific Rules) in this Section 10. The parties expressly are not agreeing to the following Rules (or amended or successor rules thereof) within the Comprehensive Rules, which shall not apply to any arbitration under this Section 10 (whether or not seeking Interim Arbitral Relief): Rule 16.1 (Application of Expedited Procedures), Rule 32 (Bracketed (or High-Low) Arbitration Option), Rule 33 (Final Offer (or Baseball) Arbitration Option), and Rule 34 (Optional Arbitration Appeal Procedure). Unless the parties otherwise agree to the selection of an arbitrator for such arbitration (which may be the Emergency Arbitrator if the parties and JAMS so agree, or another arbitrator), the arbitrator shall be selected by JAMS' Chicago, Illinois office in accordance with the Comprehensive Rules and this Section 10.

e) In selecting an Emergency Arbitrator and/or regular arbitrator (as applicable), JAMS shall select and assign an arbitrator from JAMS' Chicago, Illinois arbitrator roster who shall have reasonably substantial experience in litigating or arbitrating restrictive covenant disputes or, if such arbitrator is not then available, shall select and assign an arbitrator from JAMS' Chicago, Illinois arbitrator roster who shall have reasonably substantial experience as a judge presiding over civil litigation matters in a general civil litigation division (including a general law division or general chancery division) of a federal or state court. Unless the parties otherwise agree, any arbitrator selected pursuant to this Section 10 (whether selected by the parties or by JAMS) shall be based in and reside in the Chicago, Illinois metropolitan area.

f)    The arbitrator shall have no power to modify the provisions of this Agreement (except pursuant to Section 11(i) below), and furthermore, notwithstanding any other provision of this Agreement, in no event may the arbitrator consolidate or allow any party to join any claims of any other employee or person in a single arbitration proceeding (whether as a multiple-claimant, class, collective, representative or other similar proceeding) without the express written consent of the Company and the Participant (except as otherwise required by law), and in each case the jurisdiction of the arbitrator is limited accordingly.  The arbitrator shall apply the substantive internal law of the State of Illinois, including applicable statutes of limitation, except as otherwise required by law or provided in this Section 10, and provided further (for avoidance of doubt) that privileges and other immunities from discovery or disclosure (including without limitation the attorney-client privilege and the work product doctrine) shall be governed by, and the arbitrator shall apply to such issues, federal law (including without limitation Rules 26(b)(3), (4) and (5) of the Federal Rules of Civil Procedure (as in effect or amended from time to time) and the attorney-client privilege as articulated in *Upjohn Co. v. United States*, 449 U.S. 383 (1981) and its progeny, but excluding any choice of law rules or principles (e.g., Federal Rule of Evidence 501) that might otherwise cause state law, or some other law besides federal law, to govern the attorney-client privilege or work product doctrine).  Each party to the arbitration is entitled to be represented by legal counsel of such party's choosing.  The Company shall pay the fees and costs of the arbitrator and of JAMS (including case administration, hearing room and hearing transcription fees), but each party shall be responsible for such party's own attorneys' fees and related arbitration costs and expenses except to the extent otherwise allocated by the arbitrator in accordance with the applicable Emergency Relief Procedures or Comprehensive Rules and Section 9(f) above.

g)    Adequate discovery and an opportunity to be heard and to present evidence will be permitted by the arbitrator consistent with applicable law and the objectives of arbitration, provided, however, that the parties expressly are not agreeing to Rules 17(a), 17(b) or 17(c) (or amended or successor rules thereof) within the Comprehensive Rules (Exchange of Information), which shall not apply to any arbitration under this Section 10 (whether or not seeking Interim Arbitral Relief).  The parties may serve interrogatories, document requests and requests for admission, and take depositions, as provided by and in accordance with the Federal Rules of Civil Procedure (as in effect or amended from time to time), including without limitation any limitations on discovery provided therein, except as otherwise ordered by the arbitrator following motion of a party or as agreed to by the parties.  Disclosures with respect to any expert witnesses shall be made as provided by and in accordance with Rule 26(a)(2) (except subpart (D) thereof) of the Federal Rules of Civil Procedure (as in effect or amended from time to time).  The timing of discovery and any such disclosures (including without limitation any prehearing disclosures) shall be determined by the arbitrator in accordance with the Comprehensive Rules or as agreed to by the parties.  Each party shall have the right to file a Motion (or Motions) for Summary Disposition of any given claim(s) or issue(s), which shall be considered and ruled upon by the arbitrator.

h)    The arbitrator's decision or award (whether an interim decision or award based on a request for Interim Arbitral Relief or a final decision or award deciding or resolving the claim or dispute), shall be in writing summarizing the basis therefor and shall be final and binding, and judgment thereupon may be entered in any Illinois federal or state court.

i)    Any arbitration conducted hereunder, and all communications with respect thereto or in the course thereof, including all transcripts, briefs and exhibits, shall be confidential.  Unless the parties otherwise agree in writing or except as required by law or as is necessary to enforce this Agreement or any award, the parties, their representatives, and the arbitrator shall not disclose to any third parties (other than to the parties' respective attorneys, accountants, auditors, financial advisors, and spouses, as applicable, each of whom shall maintain such information in strict confidence, and, in the case of Aon, except as reasonably necessary in the course of its business) any information regarding the arbitration process or proceedings, including any testimony, other evidence and briefs presented and the terms of any award.  All written materials and documents produced by a party, and all copies thereof, shall be returned by the other party to the producing party or destroyed (as the producing party shall direct) promptly after the arbitration is

concluded, except that legal counsel (both internal and outside, as applicable) for a party may retain copies thereof in legal counsel's confidential files.

**11. Other provisions.**

    a) **Plan Terms Take Precedence over Agreement Terms.**  RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference.  If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern.  For avoidance of doubt, the parties expressly acknowledge and agree that Sections 9, 10, 11(j) and 11(k) of this Agreement are not inconsistent with the Plan (and nothing herein shall be construed to state or suggest that any other provision of this Agreement is inconsistent with the Plan).

    b) **Prior Agreement(s) Will Not Control.**  The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this grant.

    c) **Section 409A.**  The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences.  In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions.  The Committee may modify the terms of this Agreement, the Plan or both, without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical.  This Section 10(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A.  Nothing in this Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto.  Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

    d) **Restriction on Transfer.**  RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

    e) **Right of Employment.**  Grants of RSUs under the Plan and of this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer.  This Agreement shall survive any termination of the Participant's employment for any or no reason.

    f) **Electronic Delivery and Acceptance.**  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

    g) **Need to Accept Grant.**  The Participant acknowledges that this grant must be accepted within ninety (90) days of the Grant Date in order to be eligible to receive any benefits from this grant.  If this grant is not accepted within the ninety (90)-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee.  To accept this grant, the Participant must access the www.netbenefits.fidelity.com website and follow the instructions for

acceptance.  If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to Aon's Executive Compensation Department within ninety (90) days.

**h)  Waiver; Section Headings.**  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing.  The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

**i)  Severability.**   To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

**j)  Governing Law.**   The validity, interpretation, instruction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction, and subject to Section 10 above.   The foregoing provisions of this Section 11(j) shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

**k)  Venue and Jurisdiction.**  Venue for any arbitration proceedings instituted under this Agreement shall be exclusively in Chicago, Illinois (unless the parties otherwise agree), and the parties hereby submit and agree to the exclusive jurisdiction of the State of Illinois for the purposes of any such arbitration. The parties also hereby submit and agree to the exclusive venue and exclusive jurisdiction of the federal and state courts in Chicago, Illinois for the purpose of any claim or action to enter judgment enforcing an arbitration decision or award (whether interim or final) rendered pursuant to Section 10 above, and for any other claim or action (if any) arising under or relating to this Agreement (whether or not such claim or action is validly asserted in light of Section 10 above), and the parties hereby agree that any such claim or action (if any) shall be brought exclusively in such federal and state courts in Chicago, Illinois.  Nothing in this Section 11(k) waives or limits in any way a party's arbitration or other obligations under Section 10 above or under any other provision of this Agreement.

**l)  Notice.**  All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in London, England to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief Human Resources Officer.  If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

**m)  No Advice Regarding Grant.** The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares.  The Participant is hereby advised to consult with his or her own personal tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

**n)  Imposition of Other Requirements.**  The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign any additional agreements or undertakings that may be necessary to accomplish the foregoing.

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**Signed Electronically**                          **06/11/2015**
**RSU Recipient (Participant)**                     **Date**

**FGZ7Y7VE**

**06/11/2015 01:35 pm U.S. Eastern Standard Time**

**ACCEPTED**

**EXHIBIT C**

**RESTRICTED STOCK UNIT AGREEMENT**
**UNDER AMENDED AND RESTATED**
**AON PLC 2011 INCENTIVE PLAN**

This Restricted Stock Unit Agreement (the "Agreement") is entered into between Aon plc, a public limited company incorporated under Irish law, and its Subsidiary Aon Group, Inc., a Maryland corporation with its principal place of business at 200 East Randolph Street, Chicago, Illinois (collectively, the "Company") and **HENRY F  YUAN** _____ (the "Participant").

The Company desires to grant the Participant restricted stock units ("RSUs"), each RSU representing the right to receive a Class A Ordinary Share of the Company ("Share"), $.01 par value per Share, to encourage the Participant to remain in the service of the Company or its Subsidiaries, to provide the Participant with an incentive to contribute to the financial progress of the Company, and to encourage ownership of Shares by the Participant.  Capitalized terms used but not otherwise defined in the Agreement shall have the meaning ascribed to such terms in the Amended and Restated Aon plc 2011 Incentive Plan, as amended from time to time (the "Plan").

NOW, THEREFORE, in consideration of the mutual promises hereinafter set forth, the parties hereto agree as follows:

1. **Grant of Restricted Stock Units.**  The Company grants under the Plan an award of **129** RSUs on **05/21/2020** (the "Grant Date").  The Participant understands and agrees that the Participant has no obligation to accept this Award (as a condition of employment or otherwise), and that the Participant's decision to do so by signing or accepting this Agreement, and thereby to accept all of the terms and conditions of this Agreement, is the Participant's knowing and voluntary choice after having had a full and fair opportunity to consult with legal counsel (at the Participant's cost).

2. **Vesting of Restricted Stock Units.**  The RSUs will vest in accordance with the schedule set forth in the Participant's account.   The Participant must access the www.netbenefits.com website and follow the instructions in order to view the vesting schedule.  Notwithstanding anything herein to the contrary, the Committee may cause the RSUs to vest prior to the date(s) set forth in the vesting schedule in order to satisfy any Tax-Related Items (as defined below) that arise prior to the date of settlement of the RSUs, subject to the limitations set forth in Section 3(d) of this Agreement.

3. **Tax Withholding Obligations.**  The Participant acknowledges that, regardless of any action taken by the Company and/or the Participant's employer (the "Employer"), the ultimate liability for all income tax, social insurance contributions, payroll tax, payments on account or other tax-related items related to the Participant's participation in the Plan and legally applicable to the Participant ("Tax-Related Items"), is and remains the Participant's responsibility and may exceed the amount, if any, actually withheld by the Company or the Employer.   The Participant further acknowledges that the Company and/or the Employer: (a) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of the Award, including, but not limited to, the grant, vesting or settlement of the RSUs, the issuance of Shares upon settlement of the RSUs, the subsequent sale of Shares acquired pursuant to such vesting/settlement and the receipt of any dividends and/or dividend equivalents; and (b) do not commit to and are under no obligation to structure the terms of the Award or any aspect of the RSUs to reduce or eliminate the Participant's liability for Tax-Related Items or achieve any particular tax result.  Further, if the Participant is subject to Tax-Related Items in more than one jurisdiction, the Participant acknowledges that the Company and/or the Employer (or former employer, as applicable) may be required to withhold or account for Tax-Related Items in more than one jurisdiction.

   a) Prior to any relevant taxable or tax withholding event, as applicable, the Participant agrees to make adequate arrangements satisfactory to the Company or the Employer, to satisfy all Tax-Related Items.  In this regard,

the Participant authorises the Company and/or the Employer, or their respective agents, at the Company's discretion, to satisfy the obligations with regard to all Tax-Related Items by one or a combination of the following:

(i)     withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer; or

(ii)    withholding in Shares to be issued upon vesting/settlement of the RSUs; or

(iii)   withholding from the proceeds of the sale of Shares acquired upon vesting/settlement of the RSUs either through a voluntary sale or through a mandatory sale arranged by the Company (on the Participant's behalf pursuant to this authorisation without further consent); provided, however, that if the Participant is a Section 16 officer under the Exchange Act, the Committee shall establish the method of withholding from alternatives (i) – (iii) herein.

b)  The Company and/or the Employer may withhold or account for Tax-Related Items by considering applicable statutory withholding rates or other applicable withholding rates in the Participant's jurisdiction(s), including maximum applicable rates.  If Tax-Related Items are withheld in excess of the Participant's actual tax liability, any over-withheld amount may be refunded to the Participant in cash by the Company or the Employer (with no entitlement to the equivalent in Shares) or, if not refunded, the Participant may seek a refund from the local tax, social security or other applicable authorities.  If the obligation for Tax-Related Items is satisfied by withholding in Shares, for tax purposes, the Participant shall be deemed to have been issued the full number of Shares subject to the vested RSUs, notwithstanding that a number of Shares are held back solely for the purpose of paying the Tax-Related Items.

c)  Finally, the Participant shall pay to the Company and/or the Employer any amount of Tax-Related Items that the Company and/or the Employer may be required to withhold as a result of the Participant's participation in the Plan that cannot be satisfied by the means previously described.  The Company may refuse to deliver the Shares or the proceeds of the sale of Shares if the Participant fails to comply with the Participant's obligations in connection with the Tax-Related Items.

d)  Notwithstanding anything in this Section 3 to the contrary, to avoid a prohibited distribution under Code Section 409A, if Shares underlying the RSUs will be withheld (or sold on the Participant's behalf) to satisfy any Tax-Related Items arising prior to the date of settlement of the RSUs for any portion of the RSUs that is considered "nonqualified deferred compensation" subject to Code Section 409A ("Deferred Compensation"), then the number of Shares withheld (or sold on the Participant's behalf) shall not exceed the number of Shares that equals the liability for the Tax-Related Items.

4.  **Nominal Value.**  At the time of settlement, this Award will be subject to the Participant's appropriate undertaking to pay to Aon plc a nominal value of $.01 per share (as determined in the sole discretion of Aon plc, subject to the provisions of the Aon Ireland Constitution and the Irish Companies Act 2006, as amended from time to time), and such obligation may be satisfied by the Participant in cash in any manner to be established by Aon plc in its sole discretion, including but not limited to withholding from any wages or other cash compensation paid to the Participant by the Company and/or the Employer.

5.  **Effect of Termination of Employment; Breach of Restrictive Covenants; Misconduct.**

a)  <u>**Voluntary termination (other than Retirement).**</u>  In the event that the Participant's Termination Date occurs because of the Participant's voluntary termination that does not qualify as Retirement (as defined in Section 5(d) below), the unvested portion of the RSU will be forfeited.

b)  <u>**Termination due to death.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's death, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.

c)  <u>**Termination due to disability.**</u>  In the event that the Participant's Termination Date occurs due to the Participant's disability, all unvested RSUs will be fully vested immediately and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof. "Disability"

- 2 -

for purposes of this Agreement, shall mean disability pursuant to the standards set forth in, or in circumstances where the Participant qualifies for receipt of benefits under, the long-term disability plan of the Employer.  In the absence of such a plan, the Committee shall have exclusive discretion to determine whether a Participant's employment is terminated due to disability.

**d)  Involuntary termination (other than for Cause) or Retirement.**  In the event that the Participant's Termination Date occurs as a result of the Participant's involuntary termination by the Company or Employer (other than for Cause) or the Participant's Retirement, the RSUs shall be immediately vested pro rata and the date of such termination will be considered a vesting date for purposes of the settlement provisions of Section 7 hereof.   The pro rata portion of the RSUs that shall vest shall be calculated by multiplying (i) the number of RSUs subject to the Award, by (ii) a fraction, the numerator of which shall be the number of days that have elapsed between the Grant Date and the date of the Participant's termination, and the denominator of which shall be the total number of days covered by the vesting schedule set forth in the Participant's account, and subtracting from the resulting product the number of RSUs previously vested.  The remaining unvested portion of the RSUs shall be forfeited.  For purposes of this Agreement, "Retire" or "Retirement" means a voluntary termination of employment on or after the Participant's 55th birthday for employees whose principal place of work is outside of the European Union ("EU") or the United Kingdom. A Participant on secondment will be subject to the vesting rule applicable to his or her home country.  Participants whose principal place of work is inside the EU or the United Kingdom shall not be eligible for Retirement, and their voluntary termination at any age shall be treated in accordance with Section 5(a).  The Committee shall have exclusive discretion to determine a Participant's principal place of work for purposes of this Section 5(d).

**e)  Termination for Cause.**  In the event that the Participant's Termination Date occurs because the Participant is terminated by the Company or Employer for Cause, all unvested RSUs shall be forfeited.   "Cause" shall mean the Participant's (i) performing a deliberate act of dishonesty, fraud, theft, embezzlement, or misappropriation involving the Participant's employment with the Company, its Subsidiaries or Affiliates, or breach of the duty of loyalty to the Company, its Subsidiaries or Affiliates; (ii) performing an act of race, sex, national origin, religion, disability, or age-based discrimination which after investigation, counsel to the Company reasonably concludes will result in liability being imposed on the Company, its Subsidiaries or Affiliates and / or the Participant; (iii) material violation of Company policies and procedures including, but not limited to, the Aon Code of Business Conduct; (iv) material noncompliance with any terms of this Agreement or an employment agreement; or (v) performing any criminal act resulting in a criminal felony charge brought against the Participant or a criminal conviction of the Participant (other than conviction of a minor traffic violation).

**f)  Misconduct; Breach of Restrictive Covenants.**  In the event that the Company's Chief Executive Officer determines (or, in the case of the Chief Executive Officer as Participant, the Board of Directors of the Company determines), in his or its sole discretion, as applicable, that forfeiture is appropriate based on the finding that (i) the Participant has materially violated Company policies and procedures, including (but not limited to) performing an act of race, sex, national origin, religion, disability, or age-based discrimination, or sexual harassment or any other material violation of the Aon Code of Business Conduct, or (ii) the Participant is in breach of any non-competition, non-solicitation, and/or confidentiality provisions or other restrictive covenants that apply to the Participant, all unvested RSUs shall be forfeited.

**6.  Receipt by the Participant of the Prospectus.**  The Participant acknowledges receipt of the Plan prospectus that contains the entire Plan, and is incorporated herein by reference.  The Participant represents and warrants that the Participant has read the Plan and agrees that all RSUs awarded under it shall be subject to all of the terms and conditions of the Plan.

**7.  Issuance of Shares.**  RSUs shall be converted to Shares as of the applicable vesting date. Shares will be issued to the Participant as soon as practicable (within 60 days) after the vesting date, subject to Sections 3 and 4 of this Agreement.  Notwithstanding the foregoing, for purposes of complying with Code Section 409A, if the RSUs are considered Deferred Compensation and the Shares are to be settled in connection with a termination of service, the Company and the Participant shall take all steps necessary (including with regard to any post-termination services by the Participant) to ensure that a termination contemplated under Section 5 constitutes a "separation from service" within the meaning of Code Section 409A.  In addition, if the RSUs are Deferred Compensation

and payable in connection with the Participant's separation from service, and if the Participant is a "specified employee" within the meaning of Code Section 409A on the date the Participant experiences a separation from service, then the RSUs shall be settled on the first business day of the seventh month following the Participant's separation from service, or, if earlier, on the date of the Participant's death, solely to the extent such delayed payment is required in order to avoid a prohibited distribution under Code Section 409A.

8. **Rights as Shareholder.**  The Participant shall not have voting or any other rights as a shareholder of Aon plc with respect to the RSUs. Upon issuance of the Shares pursuant to and in accordance with Section 7, the Participant will obtain full voting and other rights as a shareholder of Aon plc.

9. **Business Considerations; Restrictive Covenants; Acknowledgments; Injunctive Relief; Confidential Information; Incentive Repayment Policy.**

   a) <u>**Business Considerations.**</u>  Aon plc and its Subsidiary, Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and Aon Group, Inc.'s Subsidiaries and Affiliates (and divisions thereof) (collectively, with Aon plc, "Aon") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). The Participant further acknowledges that the Participant's material employment duties and responsibilities, including without limitation with respect to Aon clients, prospective clients, and other employees, span geographic areas that extend well beyond the state in which the Participant is physically employed and resides.   An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal support, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill.  While these clients and prospective clients may be secured or serviced by Aon employees, including the Participant, the Participant acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Participant's  employment with Aon.  In addition, the Participant acknowledges that the Participant has acquired and/or will acquire, for the purpose of furthering the Business, knowledge of Aon's confidential and proprietary information; the Participant further acknowledges Aon's legitimate interest in safeguarding confidential and proprietary information from disclosure.

   The personal identification of clients of Aon with an Aon employee, including the Participant, creates the potential for the Participant's appropriation of the benefits of the relationships developed with clients on behalf of and at the expense of Aon.  Since Aon would suffer irreparable harm if the Participant left its employ and solicited the Business of the clients and prospective clients of Aon, or solicited the employees of Aon, it is reasonable to protect Aon against certain competitive activities by the Participant for a limited period of time after the Participant leaves employment so that Aon may renew or restore its business relationship with its clients, prospective clients and employees.  Consequently, the Participant is willing to enter into the covenants set forth herein in order to provide Aon with reasonable protection for its client, prospective client and employee relationships and its investment therein as above-described, its goodwill, and its confidential and proprietary information.

   b) <u>**Covenant Not to Solicit Clients and Prospective Clients.**</u>  The Participant hereby covenants and agrees that, except with the prior written consent of Aon, the Participant (on the Participant's own behalf or on behalf of any other person or entity) will not, during the course of employment, and for a period of two years

after the Participant's Termination Date (the "Restricted Period"), directly or indirectly, call upon, solicit, accept, engage in, service or perform, other than on behalf of Aon, any business of the same type or kind as the Business performed by Aon from or with respect to (i) clients of Aon with respect to whom the Participant provided services, either alone or with others, or had a business relationship, or on whose account the Participant worked or became familiar, or supervised directly or indirectly the servicing activities related to such clients, during the 24 months prior to the Participant's Termination Date and, further provided, such clients were clients of Aon either on the Participant's Termination Date or within 12 months prior to such Termination Date and (ii) prospective clients of Aon which the Participant alone, in combination with others, or in a supervisory capacity, solicited during the six months prior to the Participant's Termination Date and to which a proposal for services was rendered by Aon during the six months prior to the Participant's Termination Date. "Client" means any person or entity listed on the books of Aon as such, or any majority owned subsidiary of a person or entity listed on the books of Aon as a client.

c) **Covenant Not to Solicit Employees.**  The Participant hereby also agrees, for the duration of the Restricted Period, not to, directly or indirectly, solicit or induce, or cause any person or other entity to solicit or induce, any employee of Aon to work for the Participant or for any third party or entity, or to leave the employ of Aon.

d) **Other Covenants.**  Notwithstanding any other language in the Agreement, including, but not limited to that found in Section 11(b), this Agreement does not preclude the enforceability of any restrictive covenant provision contained in any prior or subsequent agreement entered into by the Participant (any such covenant, an "Other Covenant"), including without limitation any covenant contained in any Confidentiality and Non-Solicitation Agreement between the Participant and any Aon entity, and further including without limitation any covenant not to compete, to solicit or perform services for clients, or to solicit employees, any confidentiality or intellectual property covenant, and any covenant with respect to a pre-resignation notice period.  Further, no Other Covenant precludes the enforceability of any provision contained in this Agreement.  No subsequent agreement entered into by the Participant may amend, supersede, or override the covenants contained herein unless such subsequent agreement specifically references subsections (b) and (c) of this Section.

e) **Acknowledgments.**   Aon and the Participant acknowledge and agree that the covenants contained in subsections (b) and (c) of this Section are necessary and reasonable for the protection of Aon and are reasonably limited with respect to the activities prohibited, duration, geographical scope and their effect on the Participant and the public. The parties acknowledge that the purpose and effect of the covenants simply are to protect Aon for a limited period of time from unfair competition by the Participant.

The Participant acknowledges that there is no general geographical restriction contained in the preceding paragraphs because the restrictions apply only to the specified clients of Aon and because the Participant's material duties, responsibilities and relationships with Aon clients, prospective clients, and employees are not limited to any particular geographic area.  Nothing in this Agreement shall prohibit the Participant from obtaining a livelihood for the Participant or the Participant's family by being engaged in the Business.

**f)** <u>**Company's Right to Injunctive Relief; Attorneys' Fees and Costs.**</u>  The Participant acknowledges that the Participant's services to Aon are of a unique character which gives them a special value to Aon, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 9 of this Agreement will result in irreparable and continuing harm to Aon, and that therefore, in addition to any other remedy which Aon may have at law or in equity in an arbitration pursuant to Section 10 below, Aon shall be entitled to emergency, injunctive or other interim relief in an arbitration pursuant to Section 10 below for a breach of this Agreement by the Participant.  The parties acknowledge and agree that each Aon entity is an intended third-party beneficiary of this Agreement, including the Employer, and may be a named plaintiff in any subsequent arbitration brought by Aon to enforce the terms of Section 9 of this Agreement.  In the event that either party brings an arbitration to enforce the terms and conditions of Section 9 of this Agreement, the prevailing party in the arbitration will recover from the non-prevailing party, in addition to any other sum that either party may be called upon by the arbitrator to pay, a reasonable sum for the prevailing party's attorney's fees and costs, to the extent so awarded by the arbitrator (subject to Section 10(f) below).

**g)** <u>**Trade Secrets and Confidential Information.**</u>

**(i)**  The Participant acknowledges that Aon's Business depends to a significant degree upon the possession of confidential, proprietary, and trade secret information which is not generally known to others, and that the profitability of such Business requires that this information remain proprietary to Aon.  The Participant recognises that, by virtue of the Participant's employment with Aon, and to assist the Participant in the solicitation, production and servicing of client Business, the Participant will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation, lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials; corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon. Confidential Information does not include any information that lawfully is or has become generally or publicly known other than through the Participant's breach of this Agreement or a breach by another person of some other obligation to Aon.  The Participant shall not, except as required in the course of employment by Aon or as otherwise provided by applicable law or in this subsection (g), disclose or use during or subsequent to the course of employment, any Confidential Information.

**(ii)**  The Participant understands that nothing contained in this Agreement limits the Participant's ability to report possible violations of law or regulation to, or file a charge or complaint with, the Securities and Exchange Commission, the Equal Employment Opportunity Commission, the National Labor Relations Board, the Occupational Safety and Health Administration, the Department of Justice, the Congress, any Inspector General, or any other federal, state or local governmental agency or commission ("Government Agencies").  The Participant further understands that this Agreement does not limit the Participant's ability to participate in any investigation or proceeding that may be conducted by any Government Agency, without notice to the Company.

Nothing in this Agreement shall limit the Participant's ability under applicable United States federal law to (i) disclose in confidence trade secrets to federal, state, and local government officials, or to an attorney, for the sole purpose of reporting or investigating a suspected violation of law or (ii) disclose trade secrets in a document filed in a lawsuit or other proceeding, but only if the filing is made under seal and protected from public disclosure.

**(iii)** Upon termination of employment or upon Aon's request (whichever is earlier), the Participant will promptly return to Aon all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information, and all other Aon property, in the Participant's possession or control, except as otherwise provided by law or in this subsection (g).  The

Participant agrees to represent in writing to Aon upon termination of employment that he or she has complied with the provisions of this subsection (g).

**h)** **Incentive Repayment Policy.** If the Participant has been designated and notified by the board of directors of Aon plc that he or she is a reporting officer for purposes of Section 16 of the Exchange Act, the Participant is subject to Aon's Incentive Repayment Policy (the "Policy"). The Policy provides that Aon plc will have the discretion to cancel or require reimbursement to the Company of the Award set forth in this Agreement if the grant or vesting was based on the achievement of financial results that were subsequently restated. The Participant can obtain a copy of the Policy from the Global Compensation team. If the Participant is subject to the Policy, by accepting this Agreement, the Participant hereby agrees and acknowledges that he or she will be bound by it.

**10. Arbitration**

**a)** The Participant and the Company (including on behalf of Aon Group, Inc.) agree that, to the maximum extent permitted by law, all claims or disputes between or involving the Participant and Aon (including without limitation any subsidiary of the Company) (i) arising under or relating to Sections 9 and 10 of this Agreement or any Other Covenant, or (ii) involving the interpretation, applicability, enforceability or formation of Sections 9 and 10 of this Agreement, any Other Covenant, or any portion thereof (including without limitation the agreement to arbitrate in this Section 10, and further including without limitation any claim or dispute alleging that Sections 9 and 10 of this Agreement, any Other Covenant, or any portion thereof is a contract of adhesion, lacks consideration, is substantively or procedurally unconscionable, is void against public policy, or otherwise is void or voidable for any reason), shall be determined and resolved exclusively by arbitration in Chicago, Illinois (or such other location to which the Participant and the Company may agree) before a single neutral arbitrator (which may include, as provided below, a single neutral Emergency Arbitrator (defined below) and then a single neutral regular arbitrator), in compliance with and as further provided in this Section 10. Any and all such claims and disputes shall be brought solely in a party's individual capacity and not as a claimant or class member (or similar capacity) in any purported multiple-claimant, class, collective, representative or other similar proceeding, except as otherwise required by law. Unless otherwise indicated in this Section 10 expressly or by context, the term "arbitrator" means an Emergency Arbitrator and/or a regular arbitrator.

**b)** The arbitrator shall have the authority to make any award or impose any remedy that is available to a court of general jurisdiction sitting in Chicago, Illinois and that was requested by a party to the claim or dispute, including without limitation the authority to award emergency, injunctive or other interim relief pending the conducting of the arbitration on the merits and the rendering of a final award, whether styled as a temporary or preliminary injunction or otherwise (collectively, "Interim Arbitral Relief"). The arbitrator shall not have the authority to make an award or impose a remedy that is not available to such a court or is not requested by such a party, and the jurisdiction of the arbitrator is limited accordingly. For avoidance of doubt, the parties hereby acknowledge and agree that the Company (including Aon Group, Inc.) or the Participant may assert a claim or dispute encompassed by this Section 10, and seek a remedy or relief for or associated with such claim or dispute (including without limitation emergency, injunctive or other interim relief, or final relief) only in arbitration pursuant to this Section 10, and may not pursue an action in court for or relating to any such claim, dispute, remedy or relief, other than as provided in Section 10(h) below solely for the purpose of entering judgment enforcing an interim or final arbitration award.

**c)** If a party seeks Interim Arbitral Relief, including without limitation to enforce any covenant in Section 9 of this Agreement or Other Covenant, the arbitration of such Interim Arbitral Relief request shall be administered by JAMS' Chicago, Illinois office and conducted in accordance with the Emergency Relief Procedures set forth in Section 2(c) of the JAMS Comprehensive Arbitration Rules & Procedures (as in effect or amended from time to time, or any successor provision thereto) (hereafter, the "Emergency Relief Procedures" and the "Comprehensive Rules," respectively), except as otherwise provided (whether or not by reference to specific Rules) in this Section 10. During the first thirty-six (36) hours after the filing with JAMS and service of the party's Interim Arbitral Relief request (or, if earlier, the first thirty-six (36) hours after the party's notification (whether or not in writing) to the other party of such request), the parties shall

make good faith efforts to confer and to agree upon an arbitrator to hear and decide such Interim Arbitral Relief request (the "Emergency Arbitrator"). If, by the end of such thirty-six (36) hour period (or such longer period to which the parties may agree), the parties are unable to so confer or otherwise do not reach agreement on an Emergency Arbitrator, or the respondent to the Interim Arbitral Relief request does not respond to or cooperate in such Emergency Arbitrator selection efforts, the Emergency Arbitrator shall be selected by JAMS' Chicago, Illinois office in accordance with the Emergency Relief Procedures and this Section 10.

d)  If a party demands arbitration and does not seek Interim Arbitral Relief, or if a request for Interim Arbitral Relief has been withdrawn, decided or otherwise resolved (whether by agreement, by an interim award by the Emergency Arbitrator, or otherwise) and the arbitration of the claim or dispute proceeds thereafter, such arbitration shall be administered by JAMS' Chicago, Illinois office and conducted in accordance with the Comprehensive Rules, except as otherwise provided (whether or not by reference to specific Rules) in this Section 10. The parties expressly are not agreeing to the following Rules (or amended or successor rules thereof) within the Comprehensive Rules, which shall not apply to any arbitration under this Section 10 (whether or not seeking Interim Arbitral Relief): Rule 16.1 (Application of Expedited Procedures), Rule 32 (Bracketed (or High-Low) Arbitration Option), Rule 33 (Final Offer (or Baseball) Arbitration Option), and Rule 34 (Optional Arbitration Appeal Procedure). Unless the parties otherwise agree to the selection of an arbitrator for such arbitration (which may be the Emergency Arbitrator if the parties and JAMS so agree, or another arbitrator), the arbitrator shall be selected by JAMS' Chicago, Illinois office in accordance with the Comprehensive Rules and this Section 10.

e)  In selecting an Emergency Arbitrator and/or regular arbitrator (as applicable), JAMS shall select and assign an arbitrator from JAMS' Chicago, Illinois arbitrator roster who shall have reasonably substantial experience in litigating or arbitrating restrictive covenant disputes or, if such arbitrator is not then available, shall select and assign an arbitrator from JAMS' Chicago, Illinois arbitrator roster who shall have reasonably substantial experience as a judge presiding over civil litigation matters in a general civil litigation division (including a general law division or general chancery division) of a federal or state court. Unless the parties otherwise agree, any arbitrator selected pursuant to this Section 10 (whether selected by the parties or by JAMS) shall be based in and reside in the Chicago, Illinois metropolitan area.

f)  The arbitrator shall have no power to modify the provisions of this Agreement (except pursuant to Section 11(i) below), and furthermore, notwithstanding any other provision of this Agreement, in no event may the arbitrator consolidate or allow any party to join any claims of any other employee or person in a single arbitration proceeding (whether as a multiple-claimant, class, collective, representative or other similar proceeding) without the express written consent of the Company and the Participant (except as otherwise required by law), and in each case the jurisdiction of the arbitrator is limited accordingly. The arbitrator shall apply the substantive internal law of the State of Illinois, including applicable statutes of limitation, except as otherwise required by law or provided in this Section 10, and provided further (for avoidance of doubt) that privileges and other immunities from discovery or disclosure (including without limitation the attorney-client privilege and the work product doctrine) shall be governed by, and the arbitrator shall apply to such issues, federal law (including without limitation Rules 26(b)(3), (4) and (5) of the Federal Rules of Civil Procedure (as in effect or amended from time to time) and the attorney-client privilege as articulated in *Upjohn Co. v. United States*, 449 U.S. 383 (1981) and its progeny, but excluding any choice of law rules or principles (e.g., Federal Rule of Evidence 501) that might otherwise cause state law, or some other law besides federal law, to govern the attorney-client privilege or work product doctrine). Each party to the arbitration is entitled to be represented by legal counsel of such party's choosing. The Company shall pay the fees and costs of the arbitrator and of JAMS (including case administration, hearing room and hearing transcription fees), but each party shall be responsible for such party's own attorneys' fees and related arbitration costs and expenses except to the extent otherwise allocated by the arbitrator in accordance with the applicable Emergency Relief Procedures or Comprehensive Rules and Section 9(f) above.

g)  Adequate discovery and an opportunity to be heard and to present evidence will be permitted by the arbitrator consistent with applicable law and the objectives of arbitration, provided, however, that the parties expressly are not agreeing to Rules 17(a), 17(b) or 17(c) (or amended or successor rules thereof) within the Comprehensive Rules (Exchange of Information), which shall not apply to any arbitration under this Section

- 8 -

10 (whether or not seeking Interim Arbitral Relief). The parties may serve interrogatories, document requests and requests for admission, and take depositions, as provided by and in accordance with the Federal Rules of Civil Procedure (as in effect or amended from time to time), including without limitation any limitations on discovery provided therein, except as otherwise ordered by the arbitrator following motion of a party or as agreed to by the parties. Disclosures with respect to any expert witnesses shall be made as provided by and in accordance with Rule 26(a)(2) (except subpart (D) thereof) of the Federal Rules of Civil Procedure (as in effect or amended from time to time). The timing of discovery and any such disclosures (including without limitation any prehearing disclosures) shall be determined by the arbitrator in accordance with the Comprehensive Rules or as agreed to by the parties. Each party shall have the right to file a Motion (or Motions) for Summary Disposition of any given claim(s) or issue(s), which shall be considered and ruled upon by the arbitrator.

**h)** The arbitrator's decision or award (whether an interim decision or award based on a request for Interim Arbitral Relief or a final decision or award deciding or resolving the claim or dispute), shall be in writing summarizing the basis therefor and shall be final and binding, and judgment thereupon may be entered in any Illinois federal or state court.

**i)** Any arbitration conducted hereunder, and all communications with respect thereto or in the course thereof, including all transcripts, briefs and exhibits, shall be confidential. Unless the parties otherwise agree in writing or except as required by law or as is necessary to enforce this Agreement or any award, the parties, their representatives, and the arbitrator shall not disclose to any third parties (other than to the parties' respective attorneys, accountants, auditors, financial advisors, and spouses, as applicable, each of whom shall maintain such information in strict confidence, and, in the case of Aon, except as reasonably necessary in the course of its business) any information regarding the arbitration process or proceedings, including any testimony, other evidence and briefs presented and the terms of any award. All written materials and documents produced by a party, and all copies thereof, shall be returned by the other party to the producing party or destroyed (as the producing party shall direct) promptly after the arbitration is concluded, except that legal counsel (both internal and outside, as applicable) for a party may retain copies thereof in legal counsel's confidential files.

## 11. Other Provisions.

**a)** **Plan Terms Take Precedence over Agreement Terms.** RSUs are granted pursuant to the Plan, the terms and conditions of which are incorporated into this Agreement by reference. If there are any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan will govern. For the avoidance of doubt, the parties expressly acknowledge and agree that Sections 9, 10, 11(j) and 11(k) of this Agreement are not inconsistent with any term or provision of the Plan, including (without limitation) Section 9.16 of the Plan (and nothing herein shall be construed to state or suggest that any other provision of this Agreement is inconsistent with the Plan).

**b)** **Prior Agreement(s) Will Not Control.** The Participant's acceptance of this Agreement will supersede provisions of any prior agreement that could be construed as governing the terms of this Award.

**c)** **Code Section 409A.** The RSUs and amounts payable thereunder are intended to be exempt from or compliant with Code Section 409A and the U.S. Treasury Regulations relating thereto so as not to subject the Participant to the payment of additional taxes and interest under Code Section 409A or other adverse tax consequences. In furtherance of this intent, the provisions of this Agreement will be interpreted, operated, and administered in a manner consistent with these intentions. The Committee may modify the terms of this Agreement and/or the Plan without the consent of the Participant, in the manner that the Committee may determine to be necessary or advisable in order to comply with Code Section 409A or to mitigate any additional tax, interest and/or penalties or other adverse tax consequences that may apply under Code Section 409A if compliance is not practical. This Section 11(c) does not create an obligation on the part of the Company to modify the terms of this Agreement or the Plan and does not guarantee that the RSUs or the delivery of Shares upon vesting/settlement of the RSUs will not be subject to taxes, interest and penalties or any other adverse tax consequences under Code Section 409A. Nothing in this

- 9 -

Agreement shall provide a basis for any person to take any action against the Company or any of its Subsidiaries or Affiliates based on matters covered by Code Section 409A, including the tax treatment of any amounts paid under this Agreement, and neither the Company nor any of its Subsidiaries or Affiliates will have any liability under any circumstances to the Participant or any other party if the RSUs, the delivery of Shares upon vesting/settlement of the RSUs or other payment or tax event hereunder that is intended to be exempt from, or compliant with, Code Section 409A, is not so exempt or compliant or for any action taken by the Committee with respect thereto.  Further, settlement of any portion of the RSUs that is Deferred Compensation may not be accelerated or postponed except to the extent permitted by Code Section 409A.

d)  **Restriction on Transfer.**  RSUs may not be sold, transferred, pledged, assigned, or otherwise alienated at any time.

e)  **Right of Employment.**  Grants of RSUs under the Plan and this Agreement do not confer upon the Participant any right to continue in the employ or service of the Employer.  This Agreement shall survive any termination of the Participant's employment for any or no reason.

f)  **Electronic Delivery and Acceptance.**  The Company may, in its sole discretion, decide to deliver any documents related to current or future participation in the Plan by electronic means.  The Participant hereby consents to receive such documents by electronic delivery and agrees to participate in the Plan through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

g)  **Need to Accept Grant.**  The Participant acknowledges that this grant must be accepted within 90 days of the Grant Date in order to be eligible to receive any benefits from this grant.  If this grant is not accepted within the 90-day period specified in the foregoing sentence, all benefits under this grant may be forfeited, as determined in the sole discretion of the Committee.  To accept this grant, the Participant must access the www.netbenefits.com website and follow the instructions for acceptance.  If this grant was distributed to the Participant via mail, the Participant must sign the Agreement and return it to the Company within 90 days.

h)  **Waiver; Section Headings.**  Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement.  Any waiver must be in writing.  The Section headings in this Agreement are for convenience only and are not to be used in interpreting this Agreement.

i)  **Severability.**  To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

j)  **Governing Law.**  The validity, interpretation, instruction, performance, enforcement and remedies of or relating to Sections 9 and 10 of this Agreement, and the rights and obligations of the parties thereunder, shall be governed by and construed in accordance with the substantive internal laws of the State of Illinois, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  With respect to all other Sections of this Agreement, the validity, interpretation, instruction, performance, enforcement and remedies of or relating to those Sections, and the rights and obligations of the parties thereunder, shall be governed and construed in accordance with the substantive internal laws of the State of Delaware, without regard to the conflict of law principles, rules or statutes of any jurisdiction.  The foregoing provisions of this subsection shall apply irrespective of whether the Participant is a party to or bound by another restrictive covenant of any kind that may be governed by the laws of another jurisdiction (if any).

k)  **Venue and Jurisdiction.**  Venue for any arbitration proceedings instituted under this Agreement shall be exclusively in Chicago, Illinois (unless the parties otherwise agree), and the parties hereby submit and agree to the exclusive jurisdiction of the State of Illinois for the purposes of any such arbitration.  The

- 10 -

parties also hereby submit and agree to the exclusive venue and exclusive jurisdiction of the federal and state courts in Chicago, Illinois for the purpose of any claim or action to enter judgment enforcing an arbitration decision or award (whether interim or final) rendered pursuant to Section 10 above, and for any other claim or action (if any) arising under or relating to this Agreement (whether or not such claim or action is validly asserted in light of Section 10 above), and the parties hereby agree that any such claim or action (if any) shall be brought exclusively in such federal and state courts in Chicago, Illinois. Nothing in this Section 11(k) waives or limits in any way a party's arbitration or other obligations under Section 10 above or under any other provision of this Agreement.

l)  **Notice.**  All notices given hereunder shall be in writing and, if intended for Aon plc, shall be addressed to it or delivered to it at its principal office in Dublin, Ireland to the attention of the General Counsel or its principal office in Chicago, Illinois to the attention of the Chief People Officer.  If intended for the Participant, notices shall be delivered personally or shall be addressed (if sent by mail) to the Participant's then current residence address as shown on the Company's records, or to such other address as the Participant directs in a notice to the Company.  All notices shall be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

m)  **Compliance with Law.**  Notwithstanding any other provision of the Plan or this Agreement, unless there is an available exemption from any registration, qualification or other legal requirement applicable to the Shares, the Company shall not be required to deliver any Shares issuable upon vesting/settlement of the RSUs prior to the completion of any registration or qualification of the Shares under any local, state, federal or foreign securities or exchange control law or under rulings or regulations of the U.S. Securities and Exchange Commission ("SEC") or of any other governmental regulatory body, or prior to obtaining any approval or other clearance from any local, state, federal or foreign governmental agency, which registration, qualification or approval the Company shall, in its absolute discretion, deem necessary or advisable.  The Participant understands that the Company is under no obligation to register or qualify the Shares with the SEC or any state or foreign securities commission or to seek approval or clearance from any governmental authority for the issuance or sale of the Shares.  Further, the Participant agrees that the Company shall have unilateral authority to amend the Plan and the Agreement without the Participant's consent to the extent necessary to comply with securities or other laws applicable to issuance of Shares.

n)  **Intellectual Property.**  The Participant acknowledges and agrees that the Company shall own all rights in all discoveries, inventions, improvements, ideas, and designs, patentable or otherwise, trade secrets, confidential information, works of authorship, writings, and copyrightable material, which are conceived, developed, created, reduced to practice, or acquired by the Participant during the Participant's employment and which relate to the business of the Company or any of its Affiliates or Subsidiaries or the actual or demonstrably anticipated research or development of Company or any of its Affiliates or Subsidiaries (collectively "Work Product").  All Work Product that is protectable by copyright is and shall be a "work made for hire," as that term is defined in the United States Copyright Act.  To the extent Work Product is not a "work made for hire" as defined in the United States Copyright Act, Participant shall and hereby does irrevocably assign to the Company the Participant's entire right, title, and interest (including without limitation all copyrights and other intellectual property rights) in and to such Work Product together with any and all causes of actions including the rights of recovery for past infringements of Work Product.  The Participant agrees to disclose promptly, fully and in writing all Work Product to the Company.  The Participant will, upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its Affiliates or Subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries. To the extent the Participant is bound by an employee handbook or contract provision that protects the Company's intellectual property at least to the extent provided in this Section 11(n), the provision set forth in such employment handbook or contractual arrangement between the Participant and the Company will prevail and govern.

o)  **No Advice Regarding Grant.**  The Company is not providing any tax, legal or financial advice, nor is the Company making any recommendations regarding the Participant's participation in the Plan, or the acquisition or sale of the underlying Shares.  The Participant should consult with his or her own personal

tax, legal and financial advisors regarding his or her participation in the Plan and execution of this Agreement, before executing this Agreement or otherwise taking any action at any time related to the Plan.

**p)** **<u>Imposition of Other Requirements</u>.**  The Company reserves the right to impose other requirements on the Participant's participation in the Plan, on the RSUs and on any Shares acquired under the Plan, to the extent the Company determines it is necessary or advisable for legal or administrative reasons, and to require the Participant to sign or accept any additional agreements or undertakings that may be necessary to accomplish the foregoing.

- 12 -

IN WITNESS WHEREOF, the parties have accepted this Agreement as of the date hereof.

**AON PLC**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

**AON GROUP, INC.**

*Gregory C. Case*

Gregory C. Case
President and Chief Executive Officer

Signed Electronically                          06/07/2020
**RSU Recipient (Participant)                          Date**
**KGVA630O**
**06/07/2020 05:08 PM U.S. Eastern Standard Time**
**ACCEPTED**

Aon RSU AA 2020 SSP-CALIFORNIA ONLY
6729651-v2\GESDMS

**EXHIBIT D**

Attachment 2

## CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT

CONFIDENTIALITY AND NON-SOLICITATION AGREEMENT ("Agreement") dated as of July 25, 2016 (the "Effective Date") between Aon Risk Services Companies, Inc., a Maryland corporation, including its affiliates, subsidiaries and parent companies (the "Company"), with its headquarters located at 200 East Randolph Street, Chicago, Illinois 60601, and Henry Yuan residing at 435 China Basin Street, San Francisco, California, 94158 (the "Employee").

R E C I T A L S

This Agreement is entered into in consideration of the Employee's employment by the Company and the further mutual consideration and covenants by the parties as set forth herein.

NOW, THEREFORE, the Company and the Employee hereby agree to be bound by this Confidentiality and Non-Solicitation Agreement, as follows.

Section 1. **Recitals and Acknowledgements; Non-Solicitation of Employees.**

(a) **Recitals and Acknowledgments**. Aon Group, Inc., a Maryland corporation with its corporate and business headquarters in Chicago, Illinois, and its subsidiaries and affiliates (and divisions thereof) including the Company, and its parent Aon plc, (collectively "Aon ") are in the business of providing conventional and alternative risk management products and services covering the businesses of insurance brokerage, reinsurance brokerage, benefits consulting, compensation consulting, human resources consulting, human resources and benefits outsourcing, management, investigatory and security consulting, managing underwriting and related services, including accounting, actuarial, claims management and handling, and information systems on behalf of commercial and individual clients which are national and international and are not confined to any geographic area (the "Business"). An essential element of the Business is the development and maintenance of personal contacts and relationships with clients and prospective clients. Aon invests considerable time and money to develop and maintain client relationships, including payment of employees' salaries, benefits, travel, entertainment and other business expenses and assistance in servicing clients by making available to its employees specially developed and researched industry data, client-specific information, legal advice, accounting support, marketing, advertising and other corporate services, as well as providing training and professional development and valuable confidential business and professional information, toward the development and maintenance of its client relationships and related goodwill. While these clients and prospective clients may be secured or serviced by Aon employees, including the Employee, the Employee acknowledges that such clients and prospective clients remain at all times the clients and prospective clients of Aon and that the goodwill engendered by the relationships is intended to inure only to the benefit of Aon; the goodwill is owned by Aon; and Aon shall be the sole beneficiary of such goodwill during and after termination of the Employee's employment with Aon.

In addition, the Employee acknowledges that he has acquired and will acquire, solely for the purpose of furthering the Business, knowledge of Aon's Confidential Information, as defined in Section 3 of this Agreement. Employee further acknowledges Aon's legitimate interest in safeguarding Confidential Information from disclosure.

(b) **Non-Solicitation of Employees and Covenant Not to Hire**. The Employee hereby agrees, during employment and for the period of two years from the date of termination of employment, not to, directly or indirectly, solicit or induce, or to cause any person or other entity to solicit or induce, any employee of Aon to work for Employee or for any third party or entity, or to leave the employ of Aon.

Section 2. **Company's Right to Injunctive Relief; Attorneys' Fees.**

The Employee acknowledges that the Employee's services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law, and that a breach of Section 1 or 3 of this Agreement will result in irreparable and continuing harm to the Company or Aon, or both, and that therefore, in addition to any other remedy which the Company or Aon, or both, may have at law or in equity, the Company and Aon shall be entitled to injunctive relief for a breach of this Agreement by the Employee. The parties acknowledge and agree that Aon plc and Aon Group, Inc. are intended beneficiaries of this Agreement, and may be named plaintiffs in any subsequent suit brought by the Company to enforce the terms of this Agreement. In the event that any action is filed in relation to Section 1 or 3 of this Agreement, the prevailing party in the action shall recover from the non-prevailing party, in addition to any other sum that either party may be called upon to pay, a reasonable sum for the prevailing party's attorney's fees.

Section 3. **Trade Secrets and Confidential Information; Inventions.**

(a) **Trade Secrets and Confidential Information.** The Employee acknowledges that Aon's business depends to a significant degree upon the possession of confidential, proprietary and trade secret information which is not generally known to others, and that the profitability of the Business of Aon requires that this information remain proprietary to Aon. The Employee recognizes that, by virtue of his employment by the Company, and to assist him in the solicitation, production and servicing of client business, he will be granted otherwise prohibited access to such information. This information (hereinafter referred to as "Confidential Information") includes, without limitation: lists of clients and prospective clients; contract terms and conditions; client information relating to services, insurance, benefits programs, employees, finances, and compensation; copyrighted materials, corporate, management and business plans and strategies; compensation and revenues; methods and strategies of marketing; market research and data; technical know-how; computer software and manuals; policies and procedures; and the conduct of the affairs of Aon.

The Employee shall not, except as required in the course of employment hereunder, disclose or use during or subsequent to the course of employment, any Confidential Information which has not been publicly disclosed (other than by Employee in breach of this provision). All Confidential Information and all records and equipment and other materials relating in any way to Confidential Information shall be and remain the sole property of Aon during and after the end of employment.

Upon termination of employment, the Employee shall promptly return to the Company all Confidential Information and all materials and all copies or tangible embodiments of materials involving Confidential Information in the Employee's possession or control. The Employee agrees to represent in writing to the Company upon termination of employment that he has complied with the provisions of this Section 3.

(b) **Inventions.** The Employee hereby assigns to the Company his entire right, title and interest in and to all discoveries and improvements, patentable or otherwise, trade secrets and ideas, writings and copyrightable material, which may be conceived by the Employee or developed or acquired by him during his employment and which may pertain directly or indirectly to the business of the Company or any of its affiliates, parent companies, or subsidiaries, and which the Employee agrees is work for hire performed in the scope of his employment. The Employee agrees to disclose fully all such developments to the Company upon its request, which disclosure shall be made in writing promptly following any such request. The Employee shall upon the Company's request, execute, acknowledge and deliver to the Company all instruments and do all other acts which are necessary or desirable to enable the Company or any of its affiliates, parent companies, or subsidiaries to file and prosecute applications for, and to acquire, maintain and enforce, all patents, trademarks, and copyrights in all countries.

Section 4. **Mergers and Consolidations; Assignability.**

The rights and obligations under this Agreement shall inure to the benefit of and be binding upon the Company and its successors and assigns. By way of explanation, and without limiting the generality of the foregoing sentence, if the Company or any entity resulting from any merger or consolidation referred to in this Section 4 is merged with or consolidated into any other entity or entities, or if substantially all of

the assets of the Company or any such entity are sold or otherwise transferred to another entity, the provisions of this Agreement shall be binding upon and shall inure to the benefit of the continuing entity in or the entity resulting from such merger or consolidation or the entity to which such assets are sold or transferred. This Agreement shall not be assignable by the Employee.

Section 5. **Miscellaneous.**

(a) **Waiver and Modification**. Waiver of any term or condition of this Agreement by any party shall not be construed as a waiver of a subsequent breach or failure of the same term or condition, or a waiver of any other term or condition of this Agreement. Any waiver must be in writing. This Agreement may not be amended, altered or modified without the prior written consent of both parties and such instrument must acknowledge that it is an amendment or modification of this Agreement.

(b) **Captions**. The captions in this Agreement are not part of its provisions, are merely for reference and have no force or effect. If any caption is inconsistent with any provision of this Agreement, such provision shall govern.

(c) **Governing Law.** The validity, interpretation, construction, performance, enforcement and remedies of or relating to this Agreement, and the rights and obligations of the parties hereunder, shall be governed by and construed in accordance with the substantive laws of the state of Employee's residence as indicated above, without regard to the conflict of law principles, rules or statutes of any jurisdiction.

(d) **Severability**. To the extent that the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, such word, phrase, clause or sentence shall be modified or deleted in such manner so as to afford the Company and Aon the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement shall not be affected thereby, the balance being construed as severable and independent.

(e) **Employee-at-Will**. Nothing in this Agreement shall be construed to create contractual employment rights other than as an employee terminable at-will.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

**Aon Risk Services Companies, Inc.**

By:

Steve Keogh
Title:  Vice President, Head of Human Resources - Aon Risk Solutions US

Henry Yuan

7/14/16
Date

**EXHIBIT E**



**Sarah Heffron** | Senior Counsel

January 27, 2021

**VIA E-MAIL** (giselenorris@gmail.com)
Gisele Norris
176 Willow Ave.
Fairfax, CA 94930

**Re:     Post-Employment Obligations**

Dear Ms. Norris:

We understand that you resigned from Aon ("Aon" or the "Company") on January 20, 2021 and accepted employment with Marsh. We write to remind you of your post-employment obligations.

During the course of your employment, you were provided access to, learned of, and were entrusted with highly sensitive information of a confidential and proprietary nature. This information has substantial economic value to Aon due to the fact that it is not generally known to the public or to persons who might obtain economic value from its disclosure or use. In addition, this information is and has been maintained as private confidential information by the Company, which has taken numerous steps to avoid its disclosure. Aon requests that you return any and all Aon confidential and proprietary information, as well as any Aon property, including, but not limited to your Aon laptop and Aon issued phone.

Pursuant to the Restricted Stock Unit Agreements you accepted on December 4, 2009 and June 11, 2015 (the "Agreements"), you agreed that during and after your employment with the Company, you would not disclose to others or use for your own benefit any of Aon's trade secret or other confidential information. Your legal obligations to maintain the secrecy of the Company's confidential and proprietary information exist even though your employment with the Company has ended. Your knowledge of Aon's confidential information could allow you to compete unfairly against the Company. A copy of the Agreements you accepted promising to abide by these, and other, obligations are enclosed.

In addition, pursuant to your Agreements you agreed that for two years after the end of your employment, you would not, directly or indirectly, solicit any of your former clients, as well as any clients on whose accounts you became familiar. This restriction includes prospective clients as well. The Agreements also prohibit you from performing work for or providing services to your former clients for two years after your employment.

Finally, the Agreements further prohibit you from directly or indirectly soliciting or inducing any Aon employees to work for you, a third party, or to leave their employment with the Company. During your restrictions period, you may not solicit, or assist others in soliciting, or hire any of Aon's current employees. Despite these obligations, Aon has serious concerns



that you may be in violation of the non-solicitation obligations. In particular, Aon finds it highly suspect that you resigned to join Marsh on the same date, the same time, and in a very similar manner to two other individuals. Moreover, Aon has reason to believe that you may have directly or indirectly contacted at least one Aon client on Marsh's behalf. Aon needs assurances from you that you have not and will use or share Aon's information with Marsh. Please confirm in writing by January 29th that you: (1) have not and will not solicit, accept, service or perform work for Marsh or any other party with Aon clients, (2) have not and will not solicit any employees of Aon to leave Aon on behalf of Marsh or any other party, (3) have no direct or indirect knowledge relating to the exits of any current or former Aon colleague to join Marsh, (4) have not retained possession, custody or control of any Aon property of any kind in any format, and (5) have and intend to comply with your obligations under the Agreements.

We intend to closely monitor your conduct with Marsh, including contact (directly or indirectly) with Aon's employees and clients, in order to ensure that you abide by your post-employment obligations. We expect that the reminder of this letter will be sufficient to make you aware of your continuing commitments to Aon. We trust your good faith will make further action on our part unnecessary.

Sincerely,

Sarah Heffron

Cc:

Charles Philpot

Phillip Luecht, Jr.

Carolyn Rincon (via e-mail carolyn.Rincon@mmc.com)
Senior Employment Counsel, Marsh & McLennan Companies

Enclosures

**EXHIBIT F**



**Sarah Heffron** | Senior Counsel

January 27, 2021

<u>**VIA E-MAIL**</u> (hfyuan@gmail.com)
Henry Yuan
19682 Solana Drive, Unit 208
Saratoga, CA 95070

**Re:    Post-Employment Obligations**

Dear Mr. Yuan:

We understand that you resigned from Aon ("Aon" or the "Company") on January 20, 2021 and accepted employment with Marsh. We write to remind you of your post-employment obligations.

During the course of your employment, you were provided access to, learned of, and were entrusted with highly sensitive information of a confidential and proprietary nature. This information has substantial economic value to Aon due to the fact that it is not generally known to the public or to persons who might obtain economic value from its disclosure or use. In addition, this information is and has been maintained as private confidential information by the Company, which has taken numerous steps to avoid its disclosure. Aon requests that you return any and all Aon confidential and proprietary information, as well as any Aon property, including, but not limited to your Aon laptop and Aon issued phone.

Pursuant to the Restricted Stock Unit Agreement you accepted on June 7, 2020 and the Confidentiality and Non-Solicitation Agreement you entered into as of July 25, 2016 (the "Agreements"), you agreed that during and after your employment with the Company, you would not disclose to others or use for your own benefit any of Aon's trade secret or other confidential information. Your legal obligations to maintain the secrecy of the Company's confidential and proprietary information exist even though your employment with the Company has ended. Your knowledge of Aon's confidential information could allow you to compete unfairly against the Company. A copy of the Agreements you accepted promising to abide by these, and other, obligations are enclosed.

In addition, pursuant to your Agreements you agreed that for two years after the end of your employment, you would not, directly or indirectly, solicit any of your former clients, as well as any clients on whose accounts you became familiar. This restriction includes prospective clients as well. The Agreements also prohibit you from performing work for or providing services to your former clients for two years after your employment.

Finally, the Agreements further prohibit you from directly or indirectly soliciting or inducing any Aon employees to work for you, a third party, or to leave their employment with the Company. During your restrictions period, you may not solicit, or assist others in soliciting,



or hire any of Aon's current employees. Despite these obligations, Aon has serious concerns that you may be in violation of the non-solicitation of employees provision. In particular, Aon finds it highly suspect that you resigned to join Marsh on the same date, the same time, and in a very similar manner to two other individuals. Aon needs assurances from you that you have not and will use or share Aon's information with Marsh. Please confirm in writing by January 29th that you: (1) have not and will not solicit, accept, service or perform work for Marsh or any other party with Aon clients, (2) have not and will not solicit any employees of Aon to leave Aon on behalf of Marsh or any other party, (3) have no direct or indirect knowledge relating to the exits of any current or former Aon colleague to join Marsh, (4) have not retained possession, custody or control of any Aon property of any kind in any format, and (5) have and intend to comply with your obligations under the Agreements.

We intend to closely monitor your conduct with Marsh, including contact (directly or indirectly) with Aon's employees and clients, in order to ensure that you abide by your post-employment obligations. We expect that the reminder of this letter will be sufficient to make you aware of your continuing commitments to Aon. We trust your good faith will make further action on our part unnecessary.

Sincerely,

Sarah Heffron

Cc:

Charles Philpot

Phillip Luecht, Jr.

Carolyn Rincon (via e-mail carolyn.Rincon@mmc.com)
Senior Employment Counsel, Marsh & McLennan Companies

Enclosures